UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
ROLANDO CHAPARRO,

                Plaintiff,           :

                          :          15 Civ. 2349 (AJP)

         -against-          :

                          :         __OPINION AND ORDER__

CAROLYN W. COLVIN, Commissioner of
Social Security,           :

             Defendant.       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**ANDREW J. PECK, United States Magistrate Judge:**

               Plaintiff Rolando Chaparro, represented by counsel (Binder & Binder), brings this action pursuant to § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social Security (the "Commissioner") denying him Social Security disability insurance benefits ("DIB").  (Dkt. No. 1: Compl.)  Presently before the Court are the parties' cross-motions for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).  (Dkt. No. 15: Chaparro Notice of Mot.; Dkt. No. 20: Comm'r Notice of Mot.)  The parties have consented to decision of the case by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  (Dkt. No. 19.)

               For the reasons set forth below, the Commissioner's motion (Dkt. No. 20) is __DENIED__, Chaparro's motion (Dkt. No. 15) is __GRANTED__, and the case is remanded to the Commissioner for further proceedings.

# FACTS

## Procedural History

Chaparro applied for DIB alleging disability since January 1, 2009, which he later amended to February 24, 2010.  (Dkt. No. 13: Administrative Record ("R.") R. 293, 420-21.) Chaparro alleged disability due to lower back pain, neck pain, left shoulder pain, severe headaches, depression, anxiety and panic attacks.  (R. 436.)   After the Commissioner denied Chaparro's application on initial review (R. 356-61), Chaparro requested a hearing (R. 362-63).  On March 12, 2013, Chaparro appeared before Administrative Law Judge ("ALJ") Katherine Edgell.  (R. 291-318.) On June 26, 2013, ALJ Edgell denied Chaparro's application, finding that Chaparro could perform sedentary work as long as he was limited to bending and squatting occasionally and performing only simple tasks.  (R. 273-85.)  On August 6, 2013, Chaparro requested Appeals Council review.  (R. 270.)  On February 4, 2015, the Appeals Council denied Chaparro's request for review.  (R. 1-4.)

## Non-Medical Evidence

Chaparro, born in 1974, was thirty-five at the alleged onset of his disability.  (R. 296.) He has a ninth grade education and previously worked as a porter.  (R. 298-99.)  Chaparro stopped working because of a lower back injury at work in 2008.  (R. 300.)  Since then, he has been unable to work because of his depression, lower back pain, neck and shoulder pain and constant headaches. (Id.)  Chaparro weighed 185 pounds at his hearing, down from 340 pounds prior to gastric surgery. (R. 296-97.)  Chaparro testified that weight loss did not improve his back pain (R. 305), and described experiencing persistent depression and "high anxiety attacks" (R. 304-05).  Chaparro testified that he had difficulty concentrating (R. 316), suffers from headaches every morning, and this pain is aggravated by walking or turning his neck (R. 314-15).

About a year prior to his hearing, Chaparro took the GED exam but failed, which he

attributed to memory problems and difficulty concentrating.  (R. 299.)  Chaparro lived with his wife and children.  (R. 306, 449-50.)  On a typical day, he tried to assist his wife with household chores, but he could not lift much and his wife did most of the cooking and cleaning.  (R. 306, 308.) Chaparro had no difficulty with personal hygiene, helped prepare meals, and drove and shopped, although his wife and children carried the groceries when they went shopping.  (R. 308, 450-53.) Chaparro spent most of his days in the house and he would nap during the day.  (R. 307, 309.)  He could walk about two blocks before needing to sit down for half an hour.  (R. 309.)  He could sit for fifteen to thirty minutes (id.), and occasionally could lift his daughter, who weighed twenty pounds, but "[n]ot for a very long time" (R. 307).  Chaparro reported that he could follow spoken but not written instructions, cannot stay focused, forgets what he needs to do, and has short term memory loss. (R. 456-57.)

**Medical Evidence Before ALJ Edgell**

### Dr. David Steiner

On March 12, 2009, Chaparro received a neurological evaluation from Dr. David Steiner for workers' compensation purposes.  (R. 556-60.)  Chaparro appeared alert and fully oriented, with full strength throughout his extremities.  (R. 557-58.)  Chaparro's general and neurological examination results were unremarkable, including normal motor strength, intact sensation, the ability to walk independently and a full range of motion in his cervical spine and extremities.  (R. 557-59.)  Chaparro's musculoskeletal examination results showed tenderness to

palpation, guarding and loss of lumbar lordosis[1] in Chaparro's lumbosacral[2] spine, but unremarkable results in his cervical spine, shoulder and elbows.  (R. 559.)  Dr. Steiner diagnosed Chaparro with lumbosacral radiculopathy[3] and lumbosacral sprain/strain.  (R. 556, 560.)  Dr. Steiner opined that Chaparro should avoid heavy lifting and should perform home exercises.  (R. 560.)

**Dr. Arnold Wilson**

On August 4, 2009, orthopedic surgeon Dr. Arnold Wilson evaluated Chaparro for lower back pain from an April 2008 work injury.  (R. 573.)  Chaparro reported that he had been injured on the job in 2008, and had been unsuccessfully treated with medications and physical therapy.  (Id.)  Examination revealed moderate paravertebral muscle tenderness in Chaparro's lumbar spine.  (Id.)  Dr. Wilson reviewed a lumbar spine MRI for Chaparro, which revealed a disc bulge at L5-S1.  (Id.)  Dr. Wilson diagnosed Chaparro with a work related lower back sprain/strain.  (Id.)  Physical therapy and medication were continued.  (Id.)

On January 27, 2010, Chaparro returned to Dr. Wilson for follow-up.  (R. 578.)  Dr. Wilson noted that Chaparro remained "symptomatic, out of work, and participating in physical therapy three times a week."  (Id.)  Examination revealed a decreased range of motion and tenderness to palpation in Chaparro's lumbar spine, a positive straight leg raising test on the right

---

[1]   "Lordosis" refers to a concave portion of the vertebral column as seen from the side, also called a hollow back, saddle back or sway back.  Dorland's Illustrated Medical Dictionary at 1074 (32d ed. 2012).

[2]   "Lumbosacral" refers to the vertebrae in the lumbar and sacral regions.  Dorland's Illustrated Medical Dictionary at 1076.

[3]   "Lumbosacral radiculopathy" is a disease of the nerve roots in the lumbar and sacral segments of the spinal cord.  Dorland's Illustrated Medical Dictionary at 1571.

and radicular[4] pain throughout the right lower extremity.  (R.578.)  Dr. Wilson diagnosed lumbar radiculitis[5] with disc bulging at L5-S1 and requested authorization for a lumbar disc brace for Chaparro.  (R.578.)  Dr. Wilson prescribed Ultram and referred Chaparro to pain management.  (Id.) Dr. Wilson opined that Chaparro was "totally disabled."  (Id.)

On March 8, 2010, Chaparro again visited Dr. Wilson.  (R. 577.)  Chaparro was walking with a cane, and examination revealed tenderness to palpation along the lumbar region and right sciatic notch, as well as pain with straight leg raise on the right.  (Id.)  Dr. Wilson again diagnosed lumbar disc bulge at L5-S1 and right-sided radiculopathy.  (Id.)

On April 19, 2010, Dr. Wilson evaluated Chaparro for back pain, and for right shoulder pain resulting from a car accident in September 2008.  (R. 499, 576.)  Examination revealed diffuse tenderness in Chaparro's right shoulder, painful range of motion, slight weakness and limited range of motion in flexion.  (R. 499.)  Dr. Wilson also noted that Chaparro was wearing an unloader type lumbar brace.  (R. 576.)  A lumbar spine examination found that Chaparro had tenderness to palpation in the lower back and moderate pain with straight leg raising bilaterally. (Id.)  Dr. Wilson recommended epidural steroid injections (id.), and arthroscopic surgery (R. 499). On April 21, 2010, a cervical spine MRI revealed that Chaparro had bulging discs at C4-5, C5-6 and C6-7.  (R. 500.)

Chaparro saw Dr. Wilson on May 7, May 27, July 8 and September 16, 2010.  (R. 496-98, 574-75, 1044-45.)  On September 21, 2010, Dr. Wilson performed arthrosporic right

---

[4]     "Radicular" means "of or pertaining to a root . . . or radicle."  Dorland's Illustrated Medical Dictionary at 1571.

[5]     "Radiculitis" is an inflammation of the root of a spinal nerve.  Dorland's Illustrated Medical Dictionary at 1571.

shoulder surgery on Chaparro with debridement of the shoulder joint and subacromial decompression.  (R. 497-98.)

On October 28, 2010, Chaparro saw Dr. Wilson for follow-up.  (R. 571.)  On examination, Chaparro had tenderness to palpation in his paralumbar musculature, difficulty with range of motion in all planes, a positive straight leg raising test on the right to forty degrees.  (Id.) Chaparro ambulated with a single point cane.  (Id.)  Dr. Wilson referred Chaparro for pain management and continued his physical therapy.  (Id.) At a November 16, 2010 follow-up, Dr. Wilson noted that Chaparro was making normal recovery and not using assistive devices.  (R. 494.) Although the arthroscopic site was well-healed, Dr. Wilson noted that Chaparro had limited range of motion and compromised strength in his rotator cuff.  (Id.)  Dr. Wilson opined that Chapparo was "totally disabled at this time."  (Id.)

On December 20, 2010, Chaparro saw Dr. Wilson for further follow-up for his lower back pain.  (R. 570.)  Dr. Wilson stated that Chaparro had "decreased endurance with standing, sitting and walking."  (Id.)  Chaparro walked with a cane and wore a lumbar brace.  (Id.)  On examination, Chaparro had pain with forward flexion of his trunk that radiated down his right leg and positive straight leg raise.  (Id.)  Dr. Wilson prescribed Tramadol and opined that Chaparro was "100% disabled at this point in time."  (Id.)

On January 20, 2011, Chaparro visited Dr. Wilson again.  (R. 569.)  Chaparro reported little change in his condition and that he continued to have lower back pain that radiated down his right lower extremity.  (Id.)  On examination, Chaparro had diffuse tenderness in the lumbosacral junction, marked pain with right lower extremity leg raising, and an antalgic[6/] gait.  (R.

---

[6/]    "Antalgic"means counteracting or avoiding pain, such as a posture or gait assumed so as to
(continued...)

569.)  He continued to use a cane.  (Id.)  A February 4, 2011 follow-up showed improvement in Chaparro's range of motion, although Dr. Wilson again opined that Chaparro was "totally disabled." (R. 492.)  On February 17, 2011, Chaparro told Dr. Wilson that he experienced decreased numbness in his right leg following his first steroid injections.  (R. 568.)  Examination revealed diffuse lumbosacral tenderness, marked pain with straight leg raising to approximately forty degrees and an antalgic gait, but normal motor strength.  (Id.)

On April 25, 2011, Chaparro again saw Dr. Wilson.  (R. 566.) Dr. Wilson noted that Chaparro was post gastroplasty and had lost approximately thirty to forty pounds.  (Id.)  Chaparro continued to ambulate with a cane and only could walk two blocks.  (Id.)  On examination, Chaparro had tenderness to palpation in his lumbosacral region with a decreased range of motion and a positive straight leg raising test on his right side.  (Id.)  Dr. Wilson opined that Chaparro remained "totally disabled," and recommended continued physical therapy.  (Id.)

On June 22, 2011, Dr. Wilson re-evaluated Chaparro's lower back pain.  (R. 565.) Chaparro had lost approximately eighty pounds since a gastric bypass in March 2011, but continued to experience lower back pain.  (Id.)  Examination revealed lumbosacral tenderness to palpation with decreased range of motion in flexion to thirty degrees, low back pain with facet joint loading and a positive straight leg raise on the right.  (Id.)  Dr. Wilson reiterated that Chaparro remained totally disabled.  (Id.)

On November 4, 2011, Chaparro saw Dr. Wilson for a lumbar spine evaluation.  (R. 564.)  Chaparro reported that this back ached "all the time," although he felt "a little bit better."  (Id.)  On examination, he had vertebral and paravertebral tenderness with right lower extremity referred

---

[6/]      (...continued)
          lessen pain.  Dorland's Illustrated Medical Dictionary at 97.

pain and limited range of motion in forward flexion to seventy-five degrees.  (Id.)  On December

29, 2011, Dr. Wilson reported Chaparro's physical examination as "basically unchanged" and

diagnosed Chaparro with lumbar spine discogenic[7/] derangement with disc bulge at L4-L5.  (R. 563)

On February 27, 2012, Chaparro reported continuing lower back pain.  (R. 1026.)

Dr. Wilson noted that on examination, Chaparro continued "to have vertebral point tenderness to

palpation along the lumbosacral junction most pronounced over the right paraspinal area with right-

sided lower extremity referred pain."  (Id.)  Dr. Wilson assessed Chaparro with a "lumbar spine

discogenic derangement with disk bulge at L4-L5" and prescribed more physical therapy.  (Id.)

On March 15, 2012, Dr. Wilson completed a Multiple Impairment Questionnaire on

Chaparro.  (R. 815-22.)  Dr. Wilson reported treating Chaparro on a monthly basis since August 4,

2009 for lumbar discogenic derangement.  (R. 815.)  Chaparro's prognosis was guarded.  (Id.)

Clinical findings for Chaparro included a bulging disc at L4-5 and vertebral point tenderness along

the lumbosacral junction.  (R. 815-16.)  Chaparro's primary symptoms were paraspinal tenderness

and chronic pain in his lumbar spine and right lower extremity precipitated by a work related injury.

(R. 816-17.)  Dr. Wilson rated Chaparro's pain as a six on a ten-point scale.  (R. 817.)

Dr. Wilson opined that in an eight hour workday, Chaparro could sit for four hours,

stand/walk for one hour, and would need to get up every half hour to move around.  (Id.)  Dr. Wilson

opined that Chaparro should not lift or carry any weight and had significant limitations on

performing repetitive reaching, handling, fingering or lifting because of back pain and derangement.

(R. 818.)  Dr. Wilson found Chaparro to be moderately limited in his ability to use his upper

extremities to grasp, turn and twist objects and for reaching, including overhead movements.  (R.

---

[7/]     "Discogenic" refers to conditions caused by derangement of a vertebral disc.  Dorland's
Illustrated Medical Dictionary at 527.

818-19.)  Chaparro's symptoms were frequently severe enough to interfere with his attention and concentration.  (R. 820.)  Chaparro would need to take unscheduled breaks at unpredictable intervals three to four times during an eight hour workday, each lasting on average twenty minutes before returning to work.  (Id.)  Chaparro had good days, and bad days, and his symptoms would cause him to be absent from work two to three times per month.  (R. 821.)  Dr. Wilson opined that Chaparro's limitations began in 2008 and that Chaparro was not a malingerer.  (R. 820-21.)

On May 18, 2012, Dr. Wilson again assessed Chaparro's lumbar spine.  (R. 1025.) Chaparro had "persistent pain."  (Id.)  On examination, Chaparro had lumbosacral junction tenderness with right-sided paravertebral muscle spasms and pain over the right sacroiliac joint and a positive straight leg raise test on the right.  (Id.)

**Parkchester Family Practice**

A May 2008 MRI of Chaparro's lumbar spine showed a bulging disc abutting the anterior margin of the thecal sac.  (R. 516-17.)  A February 12, 2010 MRI of Chaparro's right shoulder revealed tendinosis[8] of the posterior-sided fibers of the supraspinatus and a type II SLAP lesion with anterosuperior extension.  (R. 501.)

On March 9, 2010, Dr. Eric Gayle evaluated Chaparro for depression.  (R. 778-79.) Dr. Gayle diagnosed limb pain, morbid obesity, and chronic depression.  (R. 779.)  Chaparro was prescribed Cymbalta for depression and pain and referred to podiatry and bariatric surgery for further evaluation.  (Id.)  Chaparro had a PHQ-9 score of thirteen.  (Id.)

At an April 6, 2010 follow-up with Dr. Gayle, Chaparro reported improvement and had improved mental status examination results, including a PHQ score reduced from thirteen to

---

[8]      "Tendinosis" is any pathologic condition of a tendon.  Dorland's Illustrated Medical Dictionary at 1881 (32d ed. 2012).

eight.  (R.774-75.)

On April 17, 2010, a cervical spine MRI showed bulging discs at C4-5, C5-6 and C6-7, all without stenosis.  (R. 500.)

In May 2010, Dr. Gina Lynch saw Chaparro for right shoulder pain.  (R. 763-66.) On examination, Chaparro was in no acute distress, showed normal extremities and had a full range of spinal motion.  (R. 765.)  On July 19, 2010, Dr. Lynch again evaluated Chaparro.  (R. 733.) Chaparro was taking Cymbalta and Tramadol, but still had fatigue and symptoms of muscle twitching for two weeks.  (Id.)  Dr. Lynch diagnosed Chaparro with diabetes mellitus type II and chronic depression.  (R. 734.)  Dr. Lynch prescribed Glipizide and advised Chaparro to stop taking Tramadol while taking Cymbalta because of potential interactions.  (Id.)

On August 17, 2010, Dr. Gayle saw Chaparro again.  (R. 715-16.)  Chaparro reported improvement with his pyschotropic medications, that he had stopped using marijuana, and stated that he felt motivated and had enrolled in GED courses.  (R. 715.)  His PHQ-9 score was 3.  (Id.) Dr. Gayle agreed with Chaparro's request to discontinue Cymbalta.  (R. 716.)

On August 20, 2010, Dr. Lynch examined Chaparro in preparation for surgery scheduled for September 9, 2010.  (R. 705-09.)  Examination findings showed that Chaparro had normal functioning in his extremities, a normal range of motion in his spine, intact muscular strength, symmetric reflexes and grossly normal sensation. (R. 705-07.)

In March 2011, Chaparro returned to Parkchester for his annual examination.  (R. 673-77.)  Chaparro showed no acute distress or significant abnormalities and was cleared for his bariatric surgery, which occurred later that month.  (R. 676-77.)

On August 30, 2011, Dr. Lynch saw Chaparro again.  (R. 647.)  On examination, Chaparro had palpable left trapezius muscle spasm and trigger point.  (Id.)  Dr. Lynch diagnosed

diabetes mellitus and muscle spasm, and prescribed Cyclobenzaprine.  (Id.)  On October 28, 2011,

Chaparro reported to Dr. Lynch that his neck pain was worsening since he started losing weight.

(R. 642.)  Chaparro was attending school but had difficulty with concentration and computation.

(Id.)  He weighed 230 pounds.  (Id.)  Dr. Lynch diagnosed neck pain and diabetes mellitus.  (Id.)

Dr. Lynch prescribed Tramadol and ordered a cervical spine MRI.  (Id.)  A December 13, 2011 MRI

of Chaparro's cervical spine revealed left foraminal C3-C4 disc/osteophyte herniation/protrusion

resulting in left lateral recess and foraminal stenosis and signs of muscle spasm with straightening

of the normal cervical lordosis.  (R. 561-62.)

On December 16, 2011, LMSW Tara Sym evaluated Chaparro.  (R. 631-38.)

Chaparro reported depression with symptoms of isolation, overeating, lack of concentration,

anhedonia,[9] lack of pleasure, anger, irritability, lack of energy and fidgeting.  (R. 633.)  Chaparro

also had difficulty controlling his anger on a daily basis, as well as fast speech, rapid thought and

hyperactivity.  (Id.)  Chaparro stated that he was trying to obtain his GED but felt that he needed

extra time for the examination because of a history of attention deficit hyperactivity disorder

("ADHD").  (Id.)  A mental status examination found Chaparro had hyperactive psychomotor

activity. (R. 635.) Chaparro's GAF score was sixty-one.[10]  (R. 636.) Sym diagnosed Chaparro with

recurrent, severe major depressive disorder without psychotic features and bipolar disorder.  (R.

---

[9]      "Anhedonia" refers to a total loss of feeling of pleasure in acts that normally give pleasure.
Dorland's Illustrated Medical Dictionary at 91.

[10]     A GAF score between forty-one and fifty indicates serious symptoms or any serious
impairment in social, occupational or school functioning.  Diagnostic & Statistical Manual
of Mental Disorders at 32 (4th ed. 1994).  A GAF score between fifty-one and sixty indicates
moderate symptoms or moderate difficulty in social, occupational or school functioning.  Id.
A GAF of sixty-one to seventy represents some mild symptoms or some difficulty in social,
occupational or school functioning.  Id.

639.)

On January 9, 2012, psychiatrist Dr. Joseph DiLullo evaluated Chaparro.  (R. 622-24.)  Chaparro reported short term memory loss, a history of ADHD and a long history of anxiety self-treated with cannabis until 2010 and alcohol until the age of thirty-two.  (R. 622.)  Chaparro was cooperative, with normal speech, full orientation, no pyschomotor abnormalities and normal thought content and processes.  (R. 623.)  Dr. DiLullo diagnosed bipolar disorder and prescribed Cymbalta and Hydroxyzine.  (R. 623-24.)  Chaparro also saw Sym on January 9, 2012.  (R. 616-19.)

On February 6, 2012, Chaparro saw Dr. DiLullo for follow-up, complaining of short-term memory loss and anxiety.  (R. 609.)  A mental status examination revealed that Chaparro had a "'really stressed'" mood and an anxious and congruent affect.  (Id.)  Dr. DiLullo diagnosed bipolar disorder and recommended that Chaparro continue Cymbalta and Hydroxyzine.  (R. 609-10.)

On April 6, 2012, Dr. DiLullo completed a Psychiatric/Psychological Impairment Questionnaire for Chaparro.  (R. 842-49.)  Dr. DiLullo reported treating Chaparro for bipolar disorder and anxiety disorder since January 9, 2012.  (R. 842.)  Chaparro had a current GAF score of 54, with a low of 49 previously.  (Id.)  Dr. DiLullo's prognosis was "guarded to fair."  (Id.)  Clinical findings included poor memory, sleep disturbance, mood disturbance, emotional lability, feelings of guilt/worthlessness, difficulty thinking or concentrating, generalized persistent anxiety and hostility and irritability.  (R. 843.)  Chaparro's primary symptoms were memory problems, anxiety, mood swings and irritability.  (R. 844.)

Dr. DiLullo opined that Chaparro was markedly limited in his ability to remember locations and work-like procedures; understand and remember simple one or two step instructions; understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular

attendance and be punctual within customary tolerance; sustain ordinary routine without supervision; complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work settings; and set realistic goals or make plans independently.  (R. 845-47.)  Chaparro had moderate limitations in his ability to carry out simple one or two step instructions; work in coordination with or proximity to others without being distracted by them; make simple work-related decisions; ask simple questions or request assistance; maintain socially appropriate behavior and to adhere to basic standards of neatness or cleanliness; be aware of normal hazards and take appropriate precautions; and to travel to unfamiliar places or use public transportation.  (Id.)  Chaparro experienced episodes of deterioration or decompensation in work or work-like settings because of his symptoms, including forgetfulness.  (R. 847.)  Increased anxiety and nervous system activation increased Chaparro's pain.  (R. 848.)  Chaparro had good days and bad days.  (Id.)  Dr. DiLullo opined that Chaparro was not a malingerer and that Chaparro's limitations began in March 2010.  (R. 848-49.)  Overall, Dr. DiLullo found Chaparro incapable of performing low-stress work.  (R. 848.)

**Dr. Charles Bagley**

On June 9, 2010, neurologist Dr. Charles Bagley evaluated Chaparro for injuries sustained in a September 2008 car accident.  (R. 553-55.)  Chaparro reported that he had difficulty with memory, episodes of disorientation, neck pain that radiated to the right shoulder with numbness and tingling in the arm and hands at times, as well as constant headaches.  (Id.)  Dr. Bagley reviewed Chaparro's cervical spine MRI, which revealed bulging discs; Chaparro's right shoulder MRI, which

14

revealed tendinosis and a SLAP lesion; and an EMG that revealed right C5-6 radiculopathy.  (Id.) Chaparro walked with a cane.  (R. 554.)  On examination, Chaparro had decreased range of cervical spine motion and trigger points in the right sacroiliac joint.  (Id.)  Dr. Bagley diagnosed cervical radiculopathy and post-traumatic tremor, depression due to chronic pain and disability, probable seizure disorder, post-concussion syndrome, post-traumatic headaches, and right knee sprain.  (R. 554-55.)  Dr. Bagley opined that Chaparro was "totally disabled" and recommended that he continue physical therapy.  (R. 555.)  Dr. Bagley prescribed a trial of collagen and increased Chaparro's dose of Ultram.  (Id.)

On July 7, 2010, Chaparro saw Dr. Bagley again.  (R. 535-37.)  Chaparro stated that he had constant lower back pain, could only sit for fifteen to twenty minutes and had to rest after walking four to five blocks, although he was able to walk without a cane or brace.  (R. 535.) Examination revealed that Chaparro had decreased range of lumbar spine motion and trigger points in his right sacroiliac joint.  (R. 536.)  Dr. Bagley diagnosed lumbar radiculopathy, sacroiliac joint dysfunction and depression due to chronic pain and disability.  (Id.)  Dr. Bagley referred Chaparro to pain management for epidural injections, recommended spinal decompression therapy, and opined that Chaparro was totally disabled.  (Id.)  At a follow-up on July 16, 2010, Chaparro's examination results were largely similar and Dr. Bagley repeated his opinion that Chaparro was totally disabled. (See R. 538-39.)

An October 27, 2010  follow-up examination by Dr. Bagley revealed that Chaparro had decreased range of motion with pain and multiple palpable trigger points in the lumbar paraspinal area.  (R. 531.)  Dr. Bagley diagnosed lumbar radiculopathy, lumbalgia[11] and

---

[11]        "-algia" denotes a painful condition.  Dorland's Illustrated Medical Dictionary at 48.

myofascitis.[12]  (R.531.)  Dr. Bagley administered a sacroiliac nerve block to the right and left L5 nerve roots.  (Id.)

On November 3, 2010, Dr. Bagley's notes show that Chaparro reported symptoms and had examination results essentially similar to his prior visits.  (R. 532-34.)  On November 10, 2010, Chaparro again had similar results to his October 2010 examination, although Dr. Bagley specified that "[t]rigger point R SI joint reproduces main pain complaint," and Chaparro's lumbar spine range of motion was improved.  (R. 525-27.)  Dr. Bagley once more opined that Chaparro was "permanent[ly] totally disabled."  (R. 526.)  Examination results from December 2010 and January 2011 matched those from November 2010.  (See R. 514-15, 522-24, 528-30.)

Dr. Bagley's May 25, 2011 progress notes show largely similar findings to the November 2010 examination, except that Dr. Bagley noted that Chaparro's "[p]ain level is constant 5/10 decreased from 8/10 prior to weight loss" and that Chaparro was in "good general health."  (R. 511-13, 519-21.)  Chaparro needed no assistive devices for movement, but reported that he used a brace at home when active.  (R. 511-12, 519-20.)  Chaparro had a normal gait, no abnormalities with heel and toe walking, a limited range of motion in his lumbar spine, and full strength in all extremities.  (R. 512, 520.)  Dr. Bagley advised Chaparro to continue physical therapy, use his back brace when at home and maintain his medication regimen.  (R. 512, 520.)

On March 15, 2012, Dr. Bagley saw Chaparro again.  (R. 808-10.)  Chaparro appeared to be in good general health and had lost 180 pounds following gastric bypass surgery.  (R. 808.)  Chaparro reported that his pain was worse in the morning and that he could only sit for twenty to thirty minutes.  (Id.)  On examination, Chaparro had limited range of motion in flexion

---

[12]  "Myofascitis" refers to inflammation of a muscle and its fascia, particular of the fascial insertion of the muscle to bone.  Dorland's Illustrated Medical Dictionary at 1223.

and extension and trigger points in the right sacroiliac joint.  (R. 809.)  Chaparro reported using no assistive devices for walking, but continued to use a back brace when active at home.  (Id.)  Dr. Bagley opined that Chaparro was "permanent[ly] totally disabled" and advised Chaparro to continue physical therapy.  (Id.)

On April 6, 2012, Dr. Bagley completed a Lumbar Spine Impairment Questionnaire for Chaparro.  (R. 835-41.)  Dr. Bagley reported treating Chaparro since August 26, 2009 for lumbar radiculopathy and sacroiliac joint dysfunction.  (R. 835.)  Chaparro's prognosis was poor.  (Id.)  Dr. Bagley opined that Chaparro could sit for one hour and stand/walk for one hour in an eight hour workday.  (R. 837.)  According to Dr. Bagley, it was necessary or medically recommended that Chaparro not sit continuously in a work setting.  (Id.)  Chaparro could lift/carry ten pounds occasionally. (R. 838.) Dr. Bagley opined that Chaparro's symptoms frequently were severe enough to interfere with his attention and concentration.  (R. 839.)  Chaparro's chronic depression contributed to the severity of his symptoms and his functional limitations.  (Id.)  Dr. Bagley did not consider Chaparro a malingerer.  (Id.)  Chaparro would need to take unscheduled breaks to rest every twenty to thirty minutes during an eight hour workday, each lasting ten to fifteen minutes before returning to work. (R. 840.)  In Dr. Bagley's opinion, Chaparro should engage in no pushing, pulling, kneeling, bending or stooping.  (Id.)

Dr. Bagley's April 19, 2012 examination of Chaparro was similar to the March 2012 exam.  (R. 1021-23.)  Dr. Bagley again opined that Chaparro remained "permanent[ly] totally disabled." (R. 1022.)

**Dr. Luciano Tuluca**

On April 23, 2012, Dr. Luciano Tuluca treated Chaparro.  (R. 868-71.)  Chaparro reported muscle aches and muscle weakness, but no arthralgias/back pain and no swelling in the

17

extremities.  (R. 870.)  On examination, Chaparro had tenderness of the paracervicals, the scalene muscle, and the supraclavicular fossa as well as reduced active and passive cervical spine range of motion; reduced strength and flexion in his neck, surpaspinatus, biceps, triceps, wrists and fingers; diminished left bicep reflex; diminished left brachioridialis reflex; and positive Spurling's test.[13] (R. 870.)

Dr. Tuluca saw Chaparro again on May 11, 2012.  (R. 872-75.)  Chaparro's reported symptoms now included back pain as well as muscle aches and muscle weakness, but were otherwise similar to his April 2012 symptoms.  (R. 874.)  Chaparro's examination results were similar to April 2012, except that there was some variance in his reduced strength, flexion, and range of motion, a negative Spurling's test and a normal left brachioridialis reflex, and Dr. Tuluca now noted decreased sensation in several fingers on Chaparro's left hand and in his left forearm.  (Id.) Dr. Tuluca noted tenderness of the sternocleidomastoid but not of the supraclavicular fossa.  (Id.) Chaparro saw Dr. Tuluca again on June 11, 2012, with identical symptoms.  (R. 876-79.)  Chaparro's examination results were similar to his May 2012 examination aside from some variance in his reduced range of motion, flexion and strength.  (R. 878.)

Chaparro returned to Dr. Tuluca on June 28, 2012 (R. 880-83) and July 11, 2012 (R. 884-87).  On both occasions, Chaparro reported symptoms identical to his May 2012 visit.  (R. 882, 886.)  Chaparro's examination results were consistent with his May 2012 examination, although he displayed a diminished left brachioridialis reflex.  (R. 882, 886.)  Similarly, on July 25, 2012, Chaparro's reported symptoms and examination results again were substantially similar to his prior

---

[13]     In the "Spurling" test for cervical radiculopathy the examiner presses down the top of the head while the patient rotates the head laterally and into hyperextension.  Dorland's Illustrated Medical Dictionary at 1900.

visits to Dr. Tuluca, aside from some variance in Chaparro's active and passive cervical spine range of motion a normal left brachioridialis reflex.  (R. 888-91.)

### Dr. Alok Sharan

On August 29, 2012, Chaparro saw Dr. Alok Sharan at the Montefiore Department of Orthopedics.  (R. 1073-75.)  Chaparro's chief complaint was neck pain radiating to his left shoulder and extending to his left elbow.  (R. 1073.)  Chaparro also reported "intermittent numbness and tingling in his bilateral upper extremities, left greater than right."  (Id.)  On examination, Chaparro had a normal gait with no acute distress but a decreased range of motion in his cervical spine.  (R. 1074.)  Chaparro's results were otherwise unremarkable.  (Id.)  Dr. Sharan noted that a cervical spine MRI Chaparro brought with him showed a "C3-4 left foraminal disc osteophyte/herniation itself and in moderate left foraminal stenosis."  (Id.)  Dr. Sharan opined that Chaparro had a "cervical radiculopathy and cervical herniated disc."  (Id.)

### Dr. Adriana Manta

On January 11, 2012, Dr. Adriana Manta evaluated Chaparro for increased neck pain aggravated by motion "worse in am with HA, pain radiating to shoulders, tingling in the left shoulder area" and lower back pain.  (R. 852-53.)  On examination, Chaparro was uncomfortable and fatigued, with a sad appearance, a guarded posture, tenderness over the bilateral cervical paraspinals, spasm of the paraspinals and upper trapezius, painful limited range of motion in all directions, positive Spurling test at the neck base, flattened lumbar lordosis, decreased range of motion in all lumbar planes, positive straight leg raise on the left to fifty degrees and on the right to forty-five degrees, a positive Patrick test bilaterally, left deltoid weakness 4/5, diffuse tenderness in the right knee, absent deep tendon reflexes at the knees, and 2/5 at the ankles.  (R. 852.)  Dr. Manta diagnosed cervical disc displacement, cervical radiculopathy and depression with anxiety.

(R. 852-53.)  Dr. Manta prescribed aquatherapy and a TENS unit.  (R. 853.)

On April 10, 2012, Chaparro complained to Dr. Manta of neck and back pain.  (R. 854-55.)  On examination, Chaparro had a normal gait, positive straight leg raising and a limited range of motion in his neck and spine.  (R. 854.)  He had a full range of motion in his shoulders, but reported that movement aggravated his neck pain.  (Id.)  Dr. Manta advised Chaparro to continue therapy, TENS unit use and home exercises.  (R. 855.)

On May 10, 2012, Chaparro again saw Dr. Manta.  (R. 856-57.)  Chaparro continued to have a limited range of motion in his spine and neck, a full range of motion in his shoulders and a normal gait.  (R. 856.)  Dr. Manta recommended epidural steroid injections.  (R. 857.)

On September 10, 2012, Chaparro's condition was not significantly different, although he stated that his neck pain was not improved and that he had difficulty moving his neck, looking down, walking and driving.  (R. 1064-65.)  Epidural injections had not provided relief.  (R. 1064.)  On examination, Chaparro had a normal gait, decreased range of motion in his cervical spine with tenderness and positive straight leg raising.  (Id.)  Dr. Manta recommended cervical spine surgery.  (R. 1065.)

**Montefiore Medical Center**

Over the course of two sessions on November 13, 2012 and December 13, 2012, Chaparro receive a neuropsychological evaluation at Montefiore Medical Center from clinical neuropsychologist Ronda Facchini, clinical professor of neurology David Masur, and neuropsychology intern Erica Weiss.  (R. 1058-63.)  The evaluators administered a range of tests including the Wechsler Adult Intelligence Scale.  (R. 1058.)  Chaparro had a full scale IQ score of seventy-seven, with discrepancies between his verbal comprehension score of ninety-three and working memory index score of sixty-nine, such that his IQ was not a "valid unitary measure" of

his capabilities.  (R. 1059-60.)  Overall, Chaparro's level of intellectual functioning was "within the borderline to low average ranges with stronger verbal than non-verbal abilities."  (R. 1062.) Chaparro's general fund of knowledge and visual rotation/puzzle solving skills were within the average range.  (Id.)  His vocabulary and abstract verbal reasoning were "low average," while his spatial construction abilities, pattern recognition/completion, timed transcription, oral arithmetic, and rapid visuo-motor search were "were within the borderline range."  (Id.)  His auditory attention and concentration was impaired.  (Id.)  Chaparro had low-to-average story recall but impaired list learning and recall.  (Id.)  "Phonemic fluency was low average, categorical retrieval was borderline and confrontational naming performance was weak."  (Id.)  Chaparro also had significant difficulties "on a task of sustained attention and concentration" and on "measures of executive functioning." (Id.)  "Mr. Chaparro presented with significant depressive and anxious symptomatology that actively impacted upon his performance and is actively impacting upon his daily functioning."  (Id.)  In conclusion, the evaluators opined that "Mr. Chaparro presented with life-long low average to borderline abilities with significant difficulty on tasks of attention/concentration and executive functioning, which appear to be moderated by significant emotional distress."  (Id.)

### Dr. Michael Katz

In June 2009, orthopedist Dr. Michael Katz examined Chaparro in connection with his April 2008 workplace injury.  (R. 549-52.)  Chaparro complained of lower back pain and reported that he had participated in physical therapy two to three days per week but not returned to work.  (R. 549.)  Physical examination showed negative straight leg raising and a limited range of motion in Chaparro's spine.  (R. 550-51.)  Dr. Katz diagnosed lumbosacral radiculopathy, and advised Chaparro to use home stretching exercises.  (R. 551.)  Dr. Katz opined that Chaparro had an "ongoing mild partial degree of disability."  (Id.)  When Dr. Katz pointed out "several

inconsistencies" in Chaparro's claims, such as the fact that Chaparro's cane had  "virtually no wear at the tip in spite of the fact that  . . . [Chaparro] weighs 340 lbs.," Chaparro "went into a rage."  (R. 550-52.)  Chaparro reported that he was willing to return to work and actively looking.  (R. 552.)  Dr. Katz opined that Chaparro was capable of returning to gainful employment, lighter than porter work, such as seated work.  (Id.)

On July 14, 2010, Dr. Katz re-evaluated Chaparro at the request of the workers' compensation insurance carrier.  (R. 544-48.)  On examination, Chaparro had a limited range of motion in his spine and negative straight leg raising.  (R. 545-46.)  Dr. Katz diagnosed lumbosacral radiculopathy and recommended epidural steroid injections.  (R. 546-47.)  Dr. Katz again opined that Chaparro could not perform his past work as a porter, but could perform "seated work" which limited his standing, stooping and bending and lifting to no more than thirty pounds.  (R. 547.)  Dr. Katz opined that Chaparro has "an ongoing mild partial degree of disability" which may be permanent.  (R. 547-48).

Chaparro saw Dr. Katz again in February 2011.  (R. 541-43.)  Dr. Katz reviewed Chaparro's most recent records and reiterated that, in his opinion, Chaparro did not need additional general physical therapy, but instead would benefit from targeted therapy to treat his acute back pain.  (R. 542-43.)

**Dr. Arlene Broska**

On February 22, 2012, SSA consultative psychologist Dr. Arlene Broska evaluated Chaparro.  (R. 798-802.)  A mental status examination showed Chaparro's manner of relating, social skills, and overall presentation were adequate, as were his expressive and receptive language abilities.  (R. 799.)  His thinking was coherent and goal-directed with no evidence of hallucinations, delusions, or paranoia.  (Id.)  Chaparro had a neutral mood with a full range of affect and appropriate

speech and thought content.  (Id.)  Chaparro had intact attention and concentration, could count and could do simple calculations, but could not spell the word "'world'" forward or backward.  (R. 800.) His recent and remote memory skills were within normal limits.  (Id.)  Chaparro's intellectual functioning was below average, although he had fair insight and judgment.  (Id.)

Dr. Broska opined that Chaparro could follow and understand simple directions, perform simple tasks independently, maintain attention and concentration, and learn new tasks.  (Id.) Chaparro could maintain a regular schedule unless contraindicated for medical reasons, and could perform complex tasks independently.  (Id.) Chaparro could make some appropriate decisions and relate adequately with others, but may not always deal with stress appropriately.  (R. 800-01.)  Dr. Broska diagnosed bipolar disorder NOS; alcohol abuse/dependence in remission; cannabis abuse/dependence in remission; back, neck and shoulder problems/pain, history of diabetes and history of sleep apnea.  (R. 801.) Chaparro's prognosis was fair.  (Id.)  Overall, Dr. Broska opined that the "results of the examination appear to be consistent with psychiatric problems and a history of substance abuse, but in itself, this does not appear to be significant enough to interfere with [Chaparro's] ability to function on a daily basis."  (Id.)

**Dr. Barbara Akresh**

On February 22, 2012, SSA consultative physician Dr. Barbara Akresh evaluated Chaparro.  (R. 803-07.)  Chaparro reported a work-related injury in April 2008 and a car accident in September 2008, both of which caused lower back pain and right shoulder pain.  (R. 803.) Chaparro reported that he could not sit for more than twenty minutes at a time and cannot stand for "too long." (R. 803.)  His activities of daily living included cooking and watching television.  (R. 805.)  Chaparro did not clean or wash laundry due to his pain when bending, pulling, standing and lifting.  (Id.)

On examination, Chaparro had some pain with cervical spine range of motion, some tenderness in the C6-7 midline region, pain and limited lumbar spine range of motion, tenderness in the midline L1-5, positive straight leg raise on the right, and tenderness in both shoulders anteriorly.  (R. 806.)  Chaparro had no acute distress, a normal gait, difficulty walking on his heels and toes, and the ability to rise from his chair without difficulty.  (R. 805.)  Chaparro was neurologically intact, with full strength throughout his extremities and intact hand and finger dexterity.  (R. 806-07.)

Dr. Akresh diagnosed Chaparro with a history of hypertension and diet-controlled diabetes mellitus; history of job related injury and chronic low back pain; history of motor vehicle accident with chronic pain in the neck, head and left shoulder; history of memory loss; history of sleep apnea; status post gastric bypass, reducible umbilical hernia; and status post right shoulder arthroscopic surgery.  (R. 807.)  Dr. Akresh opined that Chaparro had moderate limitations in his ability to lift and carry heavy objects secondary to the herniated disc in his cervical spine, chronic low back pain and umbilical hernia.  (Id.)

**Dr. R. Altmansberger**

On April 3, 2012, state agency psychiatrist Dr. R. Altmansberger reviewed the evidence in Chaparro's file and assessed mild restrictions in Chaparro's activities of daily living and moderate restrictions in his social functioning, concentration, persistence and pace.  (R. 344-51.)  Dr. Altmansberger opined that Chaparro could perform simple, sedentary work.  (R. 348-50.)

**ALJ Edgell's Decision**

On June 26, 2013, ALJ Edgell denied Chaparro's application for benefits.  (R. 273-85.)  ALJ Edgell applied the appropriate five-step analysis.  (R. 276-84.)  At step one, ALJ Edgell found that Chaparro had "not engaged in substantial gainful activity since February 24, 2010, the

amended alleged onset date."  (R. 278.)

At step two, ALJ Edgell found that Chaparro had "the following severe impairments: a right shoulder impingement with partial rotator cuff tear; status post SLAP repair; a history of obesity status post gastric bypass surgery; a history of sleep apnea; an abdominal hernia; hypertension; diabetes mellitus; lumbar and cervical disc bulges; a bipolar disorder; and low intellectual functioning."  (Id.)  According to ALJ Edgell, these "impairments result[] in limitations that significantly affect [Chaparro's] ability to perform basic work activities."  (Id.)

At step three, ALJ Edgell determined that Chaparro did "not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  (R. 278.)  ALJ Edgell found that Chaparro's back condition did not meet the criteria of listing 1.04 because "none of the medical records establishes findings or symptoms severe enough to qualify under listing 1.04.  Furthermore, even considering the effects of [Chaparro's] obesity, the relative normal neurological findings . . . indicate that this listing has not been medically equaled."  (R. 278-79.)  Chaparro's shoulder impairment did not meet the criteria of a listed impairment because Chaparro was "able to perform fine and gross movements effectively."  (R. 279.)  With respect to Chaparro's mental impairments, ALJ Edgell found that they did not meet or medically equal the criteria of listing 12.04 because Chaparro had only mild restrictions on his activities of daily living and social functioning, moderate difficulties with concentration, persistence or pace, and no episodes of decompensation of extended duration.  (Id.)

ALJ Edgell found that Chaparro had the residual functional capacity ("RFC") to "perform sedentary work as defined in 20 CFR 404.1567(a) (lifting/carrying 5-10 pounds occasionally, standing/walking 2 hours in an 8 hour workday, and sitting 6 hours in an 8 hour

workday) except for the following limitations: the ability to bend and squat occasionally and the ability to perform only simple tasks." (R. 280.)  In reaching that conclusion, ALJ Edgell "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence." (Id.)  ALJ Edgell "also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and SSRs 96-2p, 96-5p, 96-6p and 06-3p." (R. 280.)

ALJ Edgell found that after "careful consideration of the evidence . . . [Chaparro's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however [Chaparro's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (R. 280-81.)  ALJ Edgell found that Chaparro's allegations of back pain were inconsistent with the facts that Chaparro had "consistently been found to be neurologically intact" and that there was no "evidence of nerve root impingement." (R. 281.)  ALJ Edgell also found that "surgery to fix [Chaparro's]  rotator cuff was apparently successful as he has had good range of motion thereafter" and Chaparro's "psychiatric impairments have caused some difficulty in maintaining attention and concentration, but he has had limited treatment which tends to indicate that his mental impairments are not disabling." (Id.)  With respect to Chaparro's obesity, ALJ Edgell noted that the "medical evidence of record shows that although [Chaparro] was obese at the time of the alleged onset date, he has undergone gastric bypass surgery, which has lowered his weight from 398 pounds to 185 pounds.  The surgery has helped his gait, diabetes, and hypertension." (Id.)  ALJ Edgell also "noted that although [Chaparro] testified that his back pain [has] not improved despite his weight loss, he reported to Dr. Bagley that his pain level decreased from 8/10 to 5/10 following the weight loss." (R. 282.)

ALJ Edgell gave little weight to "Dr. Bagley's opinion limiting [Chaparro] to 1 hour sitting and standing per day, as this opinion is inconsistent with Dr. Bagley's own examination

findings."  (R. 281, record citation omitted.)  Similarly, ALJ Edgell gave little weight to "Dr. Bagley's opinion that [Chaparro] is unable to perform any postural activity" because Chaparro "himself testified that he can get in and out of a car and climb a flight of stairs to get to his apartment."  (Id.)

ALJ Edgell reviewed Chapparo's records from Dr. Wilson and Chaparro's MRI results, both of which ALJ Edgell characterized as "mild."  (R. 281.)  ALJ Edgell therefore gave little weight to Dr. Wilson's "rather extreme opinion, including a limitation on all lifting, even less than 5 pounds" because Chaparro had "full muscle strength on most examinations of record and has no atrophy 5 years after his original injury."  (Id.)  In contrast, ALJ Edgell gave great weight to Dr. Katz's opinion that while Chaparro "would not be able to work as a porter, he would be capable of seated work, with limited standing, stooping, and bending and no lifting greater than 30 pounds" because it was "consistent with Dr. Katz' observed clinical findings."  (R. 281-82.)

ALJ Edgell discussed the results of Dr. Steiner's March 2009 neurological examination of Chaparro and the results of Chaparro's August 2010 physical examination by Dr. Lynch.  (R. 282.)  ALJ Edgell also reviewed in detail the examination results from Dr. Manta, Dr. Tuluca and Dr. Sharan regarding Chaparro's neck and back pain, range of motion in his cervical spine and joints, and strength in his extremities.  (Id.)  Based on the results of Dr. Akresh's consultative examination of Chaparro, ALJ Edgell gave significant weight to Dr. Akresh's opinion that Chaparro had "moderate limitations in lifting and carrying heavy objects."  (Id.)

With respect to Chaparro's shoulder pain, ALJ Edgell reviewed Chaparro's MRI results and progress notes from Dr. Wilson.  (Id.) ALJ Edgell also noted Chaparro's testimony regarding his level of physical activity.  (Id.)  ALJ Edgell opined that:

In summary, the limitation to the sedentary level of lifting and carrying is supported

> by treatment notes suggesting that [Chaparro] suffers from neck pain, disc bulges, and a history of a shoulder impairment, all of which would limit the amount of weight he could lift.  The medical opinions of record range from opining that he can lift 0 to 30 pounds. [Chaparro] testified that he can lift his 20 pound child but has difficulty doing so.  The limitation on standing/walking 2 hours a day is supported by [Chaparro's] history of obesity and use of a cane, although he has now lost much weight and recent reports indicate that he walks with a normal gait.  The ability to sit 6 hours a day is supported by his testimony that he drives a car and by numerous medical reports showing no muscle atrophy and normal motor functioning. [Chaparro's] lumbar pathology limits his ability to bend and squat.

(R. 283.)

ALJ Edgell reviewed the results of Dr. Broska's consultative psychiatric examination, Dr. Lynch's note that Chaparro reported finding Cymbalta helpful, and the results of Chaparro's February 2012 examination by Dr. DiLullo.  (Id.)  ALJ Edgell gave "great weight" to Dr. Broska's opinion that Chaparro

> can follow and understand simple directions and instructions, can perform simple tasks independently, is able to maintain attention and concentration, is able to learn new tasks, can maintain a regular schedule unless contraindicated for medical reasons, can perform complex tasks independently, can make some appropriate decisions and can relate adequately with others, though he may not always appropriately deal with stress.

(Id.)  According to ALJ Edgell, Dr. Broska's opinion was "consistent with the results of the consultative examination."  (Id.)  ALJ Edgell gave little weight to Dr. DiLullo's opinion "as the degree of limitations is inconsistent with his own examination findings and with the findings of the psychiatric consultative examiner."  (R. 283, record citation omitted.)  Finally, ALJ Edgell based her finding that Chaparro was limited to simple, routine tasks on the "results of a neuropsychological evaluation at Montefiore Hospital" that "indicated a borderline low average IQ and difficulty with attention and concentration."  (Id.)

At step four, ALJ Edgell found that Chaparro was "unable to perform any past relevant work" because his past employment as a porter "consists of medium exertional work."  (Id.)

At step five, ALJ Edgell found that considering Chaparro's "age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Chaparro] can perform." (R. 284.)   ALJ Edgell determined that:

> If [Chaparro] had the residual functional capacity to perform the full range of sedentary work, considering [his] age, education, and work experience, a finding of "not disabled" would be directed by Medical-Vocational Rule 201.25.  However, the additional limitations have little or no effect on the occupational base of unskilled sedentary work.  A finding of "not disabled" is therefore appropriate under the framework on this rule.

(R. 284.)   Based on that finding, ALJ Edgell concluded that Chaparro had "not been under a disability, as defined in the Social Security Act, from February 24, 2010 through the date of this decision," June 26, 2013.  (Id.)

**Additional Medical Evidence and the Appeals Council's Decision**

On August 8, 2013, Chaparro requested Appeals Council review of ALJ Edgell's decision.  (R. 270.)  In support of his request for review, Chaparro submitted extensive medical records from Montefiore Medical Center from 2014 (see R. 17-269), as well as evidence from examining psychologist Dr. Ronald Sherman (see R. 8-16), and a November 25, 2013 letter from Dr. DiLullo (R. 1076).

On February 4, 2015, the Appeals Council denied Chaparro's request for review.  (R. 1-4.)  The Appeals Council considered Chaparro's reasons for seeking review and his additional evidence, but concluded that "this information does not provide a basis for changing [ALJ Edgell's] decision," since most of the records were "about a later time" than the period through June 26, 2013 that ALJ Edgell's decision addressed.  (R. 1-2.)  Therefore, the Appeals Council determined that those records did "not affect the decision whether [Chaparro was] disabled beginning on or before June 26, 2013."  (R. 2.)

**ANALYSIS**

## I.    <u>THE APPLICABLE LAW</u>

###    A.    <u>Definition of Disability</u>

A person is considered disabled for Social Security benefits purposes when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); see, e.g., Barnhart v. Thomas, 540 U.S. 20, 23, 124 S. Ct. 376, 379 (2003); Barnhart v. Walton, 535 U.S. 212, 214, 122 S. Ct. 1265, 1268 (2002); Impala v. Astrue, 477 F. App'x 856, 857 (2d Cir. 2012).[14]

> An individual shall be determined to be under a disability only if [the combined effects of] his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); see, e.g., Barnhart v. Thomas, 540 U.S. at 23, 124 S.

---

[14]    See also, e.g., Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010); Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Surgeon v. Comm'r of Soc. Sec., 190 F. App'x 37, 39 (2d Cir. 2006); Rodriguez v. Barnhart, 163 F. App'x 15, 16 (2d Cir. 2005); Malone v. Barnhart, 132 F. App'x 940, 941 (2d Cir. 2005); Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).

Ct. at 379; <u>Barnhart</u> v. <u>Walton</u>, 535 U.S. at 218, 122 S. Ct. at 1270.[15/]

      In determining whether an individual is disabled for disability benefit purposes, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." <u>Mongeur</u> v. <u>Heckler</u>, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam).[16/]

### B.    <u>Standard of Review</u>

      A court's review of the Commissioner's final decision is limited to determining whether there is "substantial evidence" in the record as a whole to support such determination. <u>E.g.</u>, 42 U.S.C. § 405(g); <u>Giunta</u> v. <u>Comm'r of Soc. Sec.</u>, 440 F. App'x 53, 53 (2d Cir. 2011).[17/] "'Thus, the role of the district court is quite limited and substantial deference is to be afforded the Commissioner's decision.'" <u>Morris</u> v. <u>Barnhart</u>, 02 Civ. 0377, 2002 WL 1733804 at *4 (S.D.N.Y.

---

[15/]    See also, <u>e.g.</u>, <u>Salmini</u> v. <u>Comm'r of Soc. Sec.</u>, 371 F. App'x at 111; <u>Betances</u> v. <u>Comm'r of Soc. Sec.</u>, 206 F. App'x at 26; <u>Butts</u> v. <u>Barnhart</u>, 388 F.3d at 383; <u>Draegert</u> v. <u>Barnhart</u>, 311 F.3d at 472; <u>Shaw</u> v. <u>Chater</u>, 221 F.3d at 131-32; <u>Rosa</u> v. <u>Callahan</u>, 168 F.3d at 77; <u>Balsamo</u> v. <u>Chater</u>, 142 F.3d at 79.

[16/]    See, <u>e.g.</u>, <u>Brunson</u> v. <u>Callahan</u>, No. 98-6229, 199 F.3d 1321 (table), 1999 WL 1012761 at *1 (2d Cir. Oct. 14, 1999); <u>Brown</u> v. <u>Apfel</u>, 174 F.3d at 62.

[17/]    See also, <u>e.g.</u>, <u>Prince</u> v. <u>Astrue</u>, 514 F. App'x 18, 19 (2d Cir. 2013); <u>Salmini</u> v. <u>Comm'r of Soc. Sec.</u>, 371 F. App'x 109, 111 (2d Cir. 2010); <u>Acierno</u> v. <u>Barnhart</u>, 475 F.3d 77, 80-81 (2d Cir.), <u>cert. denied</u>, 551 U.S. 1132, 127 S. Ct. 2981 (2007); <u>Halloran</u> v. <u>Barnhart</u>, 362 F.3d 28, 31 (2d Cir. 2004); <u>Jasinski</u> v. <u>Barnhart</u>, 341 F.3d 182, 184 (2d Cir. 2003); <u>Veino</u> v. <u>Barnhart</u>, 312 F.3d 578, 586 (2d Cir. 2002); <u>Shaw</u> v. <u>Chater</u>, 221 F.3d 126, 131 (2d Cir. 2000); <u>Brown</u> v. <u>Apfel</u>, 174 F.3d 59, 61 (2d Cir. 1999); <u>Rosa</u> v. <u>Callahan</u>, 168 F.3d 72, 77 (2d Cir. 1999); <u>Tejada</u> v. <u>Apfel</u>, 167 F.3d 770, 773 (2d Cir. 1999); <u>Perez</u> v. <u>Chater</u>, 77 F.3d 41, 46 (2d Cir. 1996); <u>Rivera</u> v. <u>Sullivan</u>, 923 F.2d 964, 967 (2d Cir. 1991); <u>Mongeur</u> v. <u>Heckler</u>, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam); <u>Dumas</u> v. <u>Schweiker</u>, 712 F.2d 1545, 1550 (2d Cir. 1983).

July 26, 2002) (Peck, M.J.).[18]

The Supreme Court has defined "substantial evidence" as "'more than a mere scintilla [and] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971); accord, e.g., Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013); Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 773-74.[19]  "[F]actual issues need not have been resolved by the [Commissioner] in accordance with what we conceive to be the preponderance of the evidence." Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982), cert. denied, 459 U.S. 1212, 103 S. Ct. 1207 (1983).  The Court must be careful not to "'substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review.'" Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991).[20]

The Court, however, will not defer to the Commissioner's determination if it is "'the product of legal error.'" E.g., Duvergel v. Apfel, 99 Civ. 4614, 2000 WL 328593 at *7 (S.D.N.Y. Mar. 29, 2000) (Peck, M.J.); see also, e.g., Douglass v. Astrue, 496 F. App'x 154, 156 (2d Cir. 2012); Butts v. Barnhart, 388 F.3d 377, 384 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Tejada v. Apfel, 167 F.3d at 773 (citing cases).

---

[18]  See also, e.g., Florencio v. Apfel, 98 Civ. 7248, 1999 WL 1129067 at *5 (S.D.N.Y. Dec. 9, 1999) (Chin, D.J.) ("The Commissioner's decision is to be afforded considerable deference; the reviewing court should not substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a de novo review." (quotations & alterations omitted)).

[19]  See also, e.g., Halloran v. Barnhart, 362 F.3d at 31; Jasinski v. Barnhart, 341 F.3d at 184; Veino v. Barnhart, 312 F.3d at 586; Shaw v. Chater, 221 F.3d at 131; Brown v. Apfel, 174 F.3d at 61; Perez v. Chater, 77 F.3d at 46.

[20]  See also, e.g., Campbell v. Astrue, 465 F. App'x 4, 6 (2d Cir. 2012); Veino v. Barnhart, 312 F.3d at 586.

The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims.  20 C.F.R. §§ 404.1520, 416.920; see, e.g., Barnhart v. Thomas, 540 U.S. 20, 24-25, 124 S. Ct. 376, 379-80 (2003); Bowen v. Yuckert, 482 U.S. 137, 140, 107 S. Ct. 2287, 2291 (1987).  The Supreme Court has articulated the five steps as follows:

> Acting pursuant to its statutory rulemaking authority, the agency has promulgated regulations establishing a five-step sequential evaluation process to determine disability.  If at any step a finding of disability or nondisability can be made, the SSA will not review the claim further.  [1] At the first step, the agency will find nondisability unless the claimant shows that he is not working at a "substantial gainful activity."  [2] At step two, the SSA will find nondisability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities."  [3] At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies.  [4] If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled.  [5] If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy.

Barnhart v. Thomas, 540 U.S. at 24-25, 124 S. Ct. at 379-80 (fns. & citations omitted).[21/]

The claimant bears the burden of proof as to the first four steps; if the claimant meets the burden of proving that he cannot return to his past work, thereby establishing a prima facie case, the Commissioner then has the burden of proving the last step, that there is other work the claimant can perform considering not only his medical capacity but also his age, education and training.  See,

---

[21/]   Accord, e.g., Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012); Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 774; see also, e.g., Jasinski v. Barnhart, 341 F.3d at 183-84; Shaw v. Chater, 221 F.3d at 132; Brown v. Apfel, 174 F.3d at 62; Balsamo v. Chater, 142 F.3d 75, 79-80 (2d Cir. 1998); Perez v. Chater, 77 F.3d at 46; Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).

e.g., Barnhart v. Thomas, 540 U.S. at 25, 124 S. Ct. at 379-80.[22/]

## II.   ALJ EDGELL ERRED IN TREATING THE GRID AS DISPOSITIVE BECAUSE CHAPARRO HAS NONEXERTIONAL LIMITATIONS

In the fifth step, the burden shifts to the Commissioner, "who must produce evidence to show the existence of alternative substantial gainful work which exists in the national economy and which the claimant could perform, considering not only his physical capability, but as well his age, his education, his experience and his training."  Parker v. Harris, 626 F.2d 225, 231 (2d Cir. 1980).[23/]

In meeting her burden under the fifth step, the Commissioner:

> may rely on the medical-vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2, commonly referred to as "the Grid".  The Grid takes into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience.  Based on these factors, the Grid indicates whether the claimant can engage in any other substantial gainful work which exists in the national economy.  Generally the result listed in the Grid is dispositive on the issue of disability.

Zorilla v. Chater, 915 F. Supp. 662, 667 (S.D.N.Y. 1996) (fn. omitted); see, e.g., Heckler v. Campbell, 461 U.S. 458, 461-62, 465-68, 103 S. Ct. 1952, 1954-55, 1956-58 (1983) (upholding the promulgation of the Grid); Roma v. Astrue, 468 F. App'x at 20-21; Martin v. Astrue, 337 F. App'x 87, 90 (2d Cir. 2009); Rosa v. Callahan, 168 F.3d at 78; Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996); Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986).

---

[22/]   See also, e.g., Selian v. Astrue, 708 F.3d at 418; Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Rosa v. Callahan, 168 F.3d at 80; Perez v. Chater, 77 F.3d at 46; Berry v. Schweiker, 675 F.2d at 467.

[23/]   See, e.g., Roma v. Astrue, 468 F. App'x 16, 20 (2d Cir. 2012); Arruda v. Comm'r of Soc. Sec., 363 F. App'x 93, 95 (2d Cir. 2010); Butts v. Barnhart, 388 F.3d 377, 381 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999).

However, "relying solely on the Grids is inappropriate when nonexertional limitations 'significantly diminish' plaintiff's ability to work so that the Grids do not particularly address plaintiff's limitations." Vargas v. Astrue, 10 Civ. 6306, 2011 WL 2946371 at *13 (S.D.N.Y. July 20, 2011); see also, e.g., Travers v. Astrue, 10 Civ. 8228, 2011 WL 5314402 at *10 (S.D.N.Y. Nov. 2, 2011) (Peck, M.J.), R. & R. adopted, 2013 WL 1955686 (S.D.N.Y. May 13, 2013); Lomax v. Comm'r of Soc. Sec., No. 09-CV-1451, 2011 WL 2359360 at *3 (E.D.N.Y. June 6, 2011) ("Sole reliance on the grids is inappropriate, however, where a claimant's nonexertional impairments 'significantly limit the range of work permitted by his exertional limitations.'").

Rather, where the claimant's nonexertional limitations "'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert." Zabala v. Astrue, 595 F.3d 402, 410 (2d Cir. 2010) (quoting Bapp v. Bowen, 802 F.2d at 605); see also, e.g., Selian v. Astrue, 708 F.3d 409, 421 (2d Cir. 2013) ("We have explained that the ALJ cannot rely on the Grids if a non-exertional impairment has any more than a 'negligible' impact on a claimant's ability to perform the full range of work, and instead must obtain the testimony of a vocational expert."); Rosa v. Callahan, 168 F.3d at 82 ("Where significant nonexertional impairments are present at the fifth step in the disability analysis, however, 'application of the grids is inappropriate.'  Instead, the Commissioner 'must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform.'" (quoting & citing Bapp v. Bowen, 802 F.2d at 603, 605-06)); Suarez v. Comm'r of Soc. Sec., No. 09-CV-338, 2010 WL 3322536 at *9 (E.D.N.Y. Aug. 20, 2010) ("If a claimant has nonexertional limitations that 'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert." (quoting Zabala v. Astrue, 595 F.3d at 411)).

ALJ Edgell relied exclusively upon the medical-vocational guidelines to determine

that jobs exist in significant numbers in the national economy that Chaparro can perform. (See page 28 above.)  In doing so, ALJ Edgell wrote:

> If [Chaparro] had the residual functional capacity to perform the full range of sedentary work, considering [his] age, education, and work experience, a finding of "not disabled" would be directed by Medical-Vocational Rule 201.25. However, the additional limitations have little or no effect on the occupational base of unskilled sedentary work.  A finding of "not disabled" is therefore appropriate under the framework on this rule.

(See page 28 above.)  ALJ Edgell had already determined that Chaparro had nonexertional limitations; specifically, that Chaparro can perform only simple tasks and has moderate limitations in his concentration, persistence and pace.  (See page 24 above.)  At step five, however, ALJ Edgell did not further explain her conclusion that these "additional limitations" had "little or no effect" on the range of work open to Chaparro.  (See R. 284.)

In relying upon the Grids, rather than the testimony of a vocational expert, ALJ Edgell was obligated to explain her finding that Chaparro's nonexertional limitations had only a negligible impact on the range of work permitted by his exertional limitations.  See, e.g., Hernandez v. Colvin, 13 Civ. 3035, 2014 WL 388415 at *15 (S.D.N.Y. Aug. 7, 2014) ("Although an ALJ has discretion to conclude that the Grid adequately addresses a plaintiff's non-exertional impairments, courts in this Circuit have held that the ALJ is obligated to explain such a finding."); Cruz v. Colvin, 12 Civ. 7346, 2013 WL 3333040 at *19 (S.D.N.Y. July 2, 2013) (Peck, M.J.) (Where the ALJ "treated the Grid as dispositive because he found that [claimant's] nonexertional limitations did not significantly reduce, or only had a negligible impact on, [claimant's] work capacity . . . [the ALJ] was obligated to explain that finding."), R. & R. adopted, 2014 WL 774966 (S.D.N.Y. Feb. 21, 2014).

Moreover, courts in this district consistently have found it to be reversible error for

ALJs to rely solely on the Grids when a plaintiff has moderate psychiatric limitations resulting in nonexertional limitations.  See, e.g., Kessler v. Colvin, 14 Civ. 8201, 2015 WL 6473011 at *2, *6-7 (S.D.N.Y. Oct. 27, 2015) (remand where ALJ "did not . . . address whether [the plaintiff's] impairments required expert testimony" and did not "identify types of unskilled jobs [the plaintiff] could perform" because the ALJ should have explained why vocational expert testimony was unnecessary for a plaintiff who could not perform his past relevant work and whose "'sole impairment [was] a mental impairment'"); Correale-Englehart v. Astrue, 687 F. Supp. 2d 396, 442 (S.D.N.Y. 2010) ("[P]laintiff's mental health symptoms -- including the noted impact of pain on her psychological status -- potentially constituted non-exertional limitations on her ability to work. Without an explanation by the ALJ of why her mental health problems did not constitute non-exertional limitations, he was obligated to conduct a non-grid assessment of her work capability under step five.  It was therefore improper for the ALJ to rely solely on the grids as the exclusive determinant of disability status . . . .  In this situation it would be necessary for the ALJ to call a vocational expert, submit other evidence of jobs that an individual with her limitations could perform, or to explain fully why plaintiff's limitations are not significant enough to warrant the opinion of such an expert." (fns. omitted)); Baldwin v. Astrue, 07 Civ. 6958, 2009 WL 4931363 at *28 (S.D.N.Y. Dec. 21, 2009) ("[W]e consider the ALJ's conclusion that the plaintiff's non-exertional limitations did not significantly impact his employment prospects to be erroneous.").

Thus, as Chaparro argues, ALJ Edgell "could not make a blanket conclusion that [Chaparro's] non-exertional limitations would have no significant impact on the performance of sedentary work." (Dkt. No. 16: Chaparro Br. at 23.)

The Commissioner argues that "the ALJ properly accommodated [Chaparro's] moderate deficiencies in concentration, persistence, or pace by limiting him to simple tasks" and that

"the occupational base specified in the Grids is not eroded where a claimant can perform simple tasks despite moderate deficiencies in concentration, persistence, or pace." (Dkt. No. 21: Comm'r Br. at 28.) In support of this argument, the Commissioner cites three cases: McIntyre v. Colvin, 758 F. 3d 146, 152 (2d Cir. 2014); Lawler v. Astrue, 512 F. App'x 108, 111-12 (2d Cir. 2013); and Zabala v. Astrue, 595 F.3d at 411. (See Comm'r Br. at 28.)

The Commissioner's reliance on McIntyre v. Colvin, 758 F.3d at 152, is misplaced. In McIntyre, the Second Circuit held that when questioning a vocational expert:

> an ALJ's failure to incorporate non-exertional limitations in a hypothetical (that is otherwise supported by evidence in the record) is harmless error if (1) "medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace" and the challenged hypothetical is limited "to include only unskilled work"; or (2) the hypothetical "otherwise implicitly account[ed] for a claimant's limitations in concentration, persistence, and pace[.]"

McIntyre v. Colvin, 758 F.3d at 152. The Second Circuit also noted that, "[t]he hypothetical presented to the vocational expert . . . closely tracked the ALJ's [RFC] assessment . . . which failed to mention explicitly [the claimant's] non-exertional limitations. The hypothetical added, however, a limitation to 'simple, routine, low stress tasks.'" Id. at 151. Thus, by "explicitly limiting the hypothetical to such tasks . . . , the ALJ sufficiently accounted for 'the combined effect of [the claimant's] impairments.'" Id. at 152. In contrast, however, ALJ Edgell had no vocational expert testimony whatsoever (see pages 24-28 above), much less testimony involving a hypothetical limited to only unskilled work or that otherwise accounted for Chaparro's nonexertional limitations.

Moreover, neither Lawler v. Astrue, 512 F. App'x at 111-12 , nor Zabala v. Astrue, 595 F.3d at 411, support the proposition that an ALJ may determine that a claimant's nonexertional limitations had little or no effect on the his occupational base without any further explanation. In Lawler v. Astrue, the Second Circuit upheld an ALJ's determination that because a claimant's "'non-

exertional limitations did not significantly narrow the range of work [he] can perform'" reliance on the Grids rather than vocational expert testimony was appropriate.  Lawler v. Astrue, 512 F. App'x at 111-12.  In doing so, the Second Circuit referred repeatedly to the ALJ's discussion of the evidence he relied upon to reach that conclusion.  See id. at 112.  Similarly, in Zabala v. Astrue, 595 F.3d at 411, the Second Circuit upheld an ALJ's reliance on the Grids following the ALJ's finding that a claimant's nonexertional limitations "did not result in an additional loss of work capacity" because the "ALJ found that Petitioner's mental condition did not limit her ability to perform unskilled work, including carrying out simple instructions, dealing with work changes, and responding to supervision."  Zabala v. Astrue, 595 F.3d at 411.  In contrast, although ALJ Edgell gave "great weight" at step three to Dr. Broska's opinion that Chaparro "can follow and understand simple directions and instructions, can perform simple tasks independently, is able to maintain attention and concentration, is able to learn new tasks, can maintain a regular schedule unless contraindicated for medical reasons, can perform complex tasks independently, can make some appropriate decisions and can relate adequately with others, though he may not always appropriately deal with stress" (see page 27 above), ALJ Edgell did not discuss how that opinion, which contains findings similar to those referenced in Zabala, related to her step five determination (see page 28 above).  Nor did ALJ Edgell provide any other discussion of what evidence she relied on to determine that Chaparro's "difficulty with attention and concentration" (see page 28 above) -- the basis of her finding limiting him to simple tasks (see page 28 above) -- had only a negligible impact on the occupational base of unskilled sedentary work (see page 28 above).

Therefore, because ALJ Edgell failed to explain why Chaparro's nonexertional limitations had only a negligible impact on the range of work available to Chaparro, the case should

39

be remanded for vocational expert testimony.[24/]

**CONCLUSION**

For the reasons discussed above, the Commissioner's motion for judgment on the pleadings (Dkt. No. 20) is <u>DENIED</u>, and Chaparro's motion for judgment on the pleadings (Dkt. No. 15) is <u>GRANTED</u> to the extent of remanding the case to the Commissioner for further proceedings. The Clerk of Court shall close the case.


SO ORDERED.

Dated:        New York, New York
              January 19, 2016



                                                    _____
                                                    **Andrew J. Peck**
                                                    United States Magistrate Judge


Copies ECF to:        All Counsel

_____

[24/]        Chaparro also argues that ALJ Edgell failed to properly weigh the medical opinion evidence (Chaparro Br. at 15-20), and failed to properly evaluate Chaparro's credibility (Chaparro Br. at 20-22), and that the Appeals Council erred when it determined that Chaparro's new evidence did not pertain to the period at issue in this case (Chaparro Br. at 24-25). Because ALJ Edgell's erroneous reliance on the Grids requires remand in any event, it is not necessary for the Court to address these arguments. Nonetheless, on remand, the ALJ should take care to properly evaluate medical opinion evidence of record and to properly explain the ALJ's determinations regarding the weight to be given to the treating physicians' opinions and Chaparro's credibility.